IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT JAMES JOHNSON,
     Plaintiff,

vs.                         Case No.: 3:16cv500/MCR/EMT

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,
     Defendant.
_____/

## **ORDER, REPORT AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Carolyn W. Colvin as the Defendant in this case.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

On June 27, 2011, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning May 1, 2010 (Tr. 12, 137).[2]  His applications were denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").  A hearing was held on July 1, 2013.  On September 18, 2013, the ALJ issued a decision finding Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (Tr. 137–46).  On January 14, 2015, the Appeals Council vacated the ALJ's decision and remanded the matter to the ALJ to proffer post-hearing evidence and to consider Plaintiff's obesity and its impact on his functioning (Tr. 155–57).  The ALJ then held a second hearing on July 17, 2015.  On August 28, 2015, he again issued a decision that found Plaintiff not disabled (Tr. 12–27).  The Appeals Council denied Plaintiff's request for review of this second decision on September 16, 2016.  Thus, the second

---

[2] All references to "Tr." refer to the transcript of Social Security Administration record filed on January 5, 2017 (ECF No. 7).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

## II.    FINDINGS OF THE ALJ

On August 28, 2015 (date of ALJ decision), the ALJ made several findings relative to the issues raised in this appeal (tr. 12–27):

1)    Plaintiff met the insured status requirements of the Act through September 30, 2013[3];

2)    Plaintiff had not engaged in substantial gainful activity since May 1, 2010, the alleged onset date;

3)    Plaintiff had the following severe impairments: mild chronic obstructive pulmonary disease, obesity, hypertension, social anxiety disorder, learning disorder, and borderline intellectual functioning;

4)    Plaintiff did  not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5)    Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except he could occasionally climb ladders, ropes, or scaffolds; could frequently climb

---

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is May 1, 2010 (date of alleged onset), through September 30, 2013 (date last insured).  The time frame relevant to his claim for SSI is June 27, 2011 (the date he applied for SSI) through August 28, 2015 (the date the ALJ issued his decision).  See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

stairs, stoop, kneel, crouch, or crawl; he was to avoid concentrated exposure to fumes, dusts, and gases; was limited to the simple, routine tasks of unskilled work requiring short, simple instructions and simple work decisions as well as few gradually-introduced changes; needed oral instructions and could not be required to read instructions, write reports, or handle money; could interact with coworkers and supervisors on a basic level but needed a well-spaced work environment to reduce the amount of interaction; and should have had no contact with the public;

6) Plaintiff was unable to perform any past relevant work;

7) Plaintiff was born on May 18, 1979, and was 30 years old, which is defined as a younger individual aged between 18 and 49, on the alleged disability onset date;

8) Plaintiff had a marginal education and was able to communicate in English;

9) Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was "not disabled," whether or not he had transferable job skills;

10) Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed;

11) Plaintiff thus was not under a disability, as defined in the Act, from May 1, 2010, through the date of the decision.

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether

the decision is supported by substantial evidence from the record and was a result of

the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the  evidence, or

substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.     If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity ("RFC") and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052

(11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

    A.    Personal History

Plaintiff testified at his July 2015 hearing that, when he was working as a plumber's assistant up until 2010, his boss Bill Duckworth was aware of his "issues," such as the fact that he could not read, and Mr. Duckworth did what he could to accommodate him (Tr. 52).  Plaintiff testified that he has panic attacks and suspected that they began after he underwent oral surgery and took narcotic pain medications in 2010 (Tr. 53–54).  He has panic attacks two to three times a week, and they can last for twenty-four hours until his medication alleviates them (Tr. 54).  He indicated that his medications make him feel drowsy or sleepy, however (Tr. 55).

At his earlier hearing in July of 2013, Plaintiff testified that he was laid off from his plumber's assistant job because of the downturn in the economy and the fact that he was going through a divorce (Tr. 78).  He indicated he visited his doctor once every three months and that his medications helped, although he had his "moments" where he has to take extra medications (Tr. 82–83).  He reported that the panic attacks

occurred two to three times a week and could last twenty-four hours or until he took enough medication (Tr. 83).  Plaintiff drew a distinction regarding the duration of his attacks, indicating that the attacks were shorter when he took his Klonopin (*id.*).

Plaintiff's wife also testified, stating that Plaintiff had hives that were likely related to his stress and they had recently become worse (Tr. 89–90).  She indicated that Plaintiff could hold a conversation for a few minutes but got moody and paced a lot when he went into a panic (Tr. 90).  She stated his attacks usually lasted between one and three hours and that he was "easily stressed out" (Tr. 90–91).

## B.     Relevant Medical History

As Plaintiff's two claims focus upon his mental health issues, the court largely confines its review of the record to that area.  In describing Plaintiff's mental health history,[5] the ALJ found Plaintiff's ongoing anxiety symptoms, as adduced from his "limited mental health treatment, contemporaneous reports of medication efficacy, and symptoms severity assessments by his treatment providers," to not be as severe as Plaintiff would represent (Tr. 19).

Plaintiff has a history of anxiety and panic attacks, having indicated that he has taken medication for the problem as far back as 2002 (Tr. 20).  Records show Plaintiff

---

[5]  Unless otherwise noted, the information in this section is derived from the opinion of the ALJ.

presenting to the emergency room on March 1, 2011, stating that he was having a panic attack but leaving without treatment (*id*.). He presented to the Lakeview Center on March 29, 2011, reporting that he had not seen a doctor in a while and requesting to see one in order to get medication for his anxiety attacks. Plaintiff was prescribed Celexa and Klonopin. On June 1, 2012, Plaintiff sought counseling because he was experiencing stress from his marriage and persistent depression evidenced by a lack of motivation and decreased interest in pleasurable activities (*id*.). He attended a recommended group therapy program but stopped attending after the first session. Plaintiff also declined individual therapy (*id*.). On January 20, 2013, Plaintiff reported increased stress because of his mother's heart problems and his difficult relationship with his stepfather. On May 14, 2013, he reported sometimes feeling stressed, and his medications were continued (*id*.).

Plaintiff attended another therapy session on March 7, 2014, reporting that he "[f]eels depressed, angry, unable to be around others, feeling uneasy, difficulty relaxing, easily annoyed, fatigued, fears dying, poor impulse control, thought racing, isolates from others, low energy, [and] has panic attacks" (Tr. 690). He stated that he had panic attacks associated with being around others or new situations, and particularly situations that involve learning new things or reading (Tr. 20, 690).

Plaintiff rated his symptoms as a five on a scale of one to nine (Tr. 690). On March 12, 2014, Plaintiff reported he had not started Effexor as prescribed because of a pharmacist's comments about it, but after receiving reassurance from his pychiatrist, he agreed to start taking the drug (Tr. 20, 691). On August 22, 2014, he denied that the Effexor was effective and was therefore prescribed Prestiq. Plaintiff continued to take Klonopin on an as-needed basis (Tr. 20). As part of a psychosocial assessment at the Lakeview Center on February 3, 2015, Plaintiff stated that the preceding month had been very stressful because he had received custody of two of his sons following the death of his ex-wife, as well as custody of a third son who was having disciplinary problems (Tr. 21, 802). On February 12, 2015, he reported depression, continued anxiety, and difficulty with sleep, but he was assessed as stable (Tr. 21).

As amply noted by the ALJ, Plaintiff's medical notes, both from the impressions of medical personnel and from Plaintiff's own subjective reporting, demonstrate that Plaintiff's symptoms were largely stabilized by medication (Tr. 20–22). Plaintiff did report side effects such as drowsiness and sexual difficulties, but adjustments to his medication regimen often ameliorated these problems. For the most part, Plaintiff experienced a heightening of symptoms only when he lapsed in taking his medication or after a medication was switched or tapered (Tr. 21–22). As

far as cognitive functioning, the ALJ noted that Plaintiff's scores on the Global

Assessment of Functioning scale (GAF) reflected persistent, mild symptoms (Tr. 22).

Plaintiff scored a composite IQ of 74; he was assessed with limited reading and

writing skills; and he reported that he had a learning disorder and the ability to read

only at a third grade level (*id*.).

The ALJ accorded great weight to the opinion of non-examining agency

psychologist David Partyka, Ph.D., rendered on May 18, 2011, who, as recited by the

ALJ, determined the following:

> David Partyka, Ph.D., opined that the claimant is capable of performing
> detailed instructions and tasks, sustaining attention and concentration for
> at least four hours at a time without being distracted by others,
> performing activities within a schedule, maintaining regular attendance,
> being punctual with customary tolerances, responding appropriately and
> adapting to changes in the environment, being aware of hazards,
> sustaining the ability to travel, and setting realistic goals. He noted the
> claimant might have mild to moderate difficulties interacting
> appropriately with the public, asking questions, and accepting
> instructions and criticism from supervisors. Nevertheless, he opined the
> claimant would be able to interact appropriately with coworkers,
> maintain socially appropriate behavior, and adhere to basic standards of
> neatness [Tr. 110–19].

(Tr. 23).

The ALJ then noted that on September 30, 2011, J. Peterson, Ph.D., J.D., also

a non-examining agency expert, affirmed Dr. Partyka's opinion (Tr. 126, 130), and

the ALJ accorded great weight to both of their opinions because those opinions were "consistent with [Plaintiff's] limited medication management and reports of medication efficacy" (Tr. 23).

The ALJ gave only little weight to the April 10, 2015, opinion of Brian Braumiller, D.O., a treating physician with the Lakeview Center, who had completed a form titled "Supplemental Questionnaire as to Residual Functional Capacity."

> [Dr. Braumiller] indicated the claimant has marked restriction of activities of daily living, difficulty in maintaining social functioning, and episodes of deterioration or decompensation in work or work-like settings as well as frequent deficiencies of concentration, persistence, or pace. He opined the claimant has a moderate limitation of his ability to perform simple tasks in a work setting but marked limitation of his abilities to understand, carry out, and remember instructions in a work setting; respond appropriately to supervision and co-workers in a work setting; and perform repetitive tasks in a work setting. He estimated the claimant would be absent four or more days per month due to his impairments or treatment. He opined these limitations lasted or could be expected to last for 12 months or longer although his opinion as to the earliest date this level of severity existed was "unknown." He indicated a psychological evaluation was not obtained. He reported side effects from the claimant's medications included sedation, nausea, fatigue, weakness, and disorientation. He indicated the claimant was "disabled from full-time continuous employment" [Tr. 883–85]. His opinion has been given little weight because it is inconsistent with the claimant's treatment records. Dr. Braumiller indicated [a] level of severity that is not supported by the claimant's outpatient psychoactive medication management, particularly since the claimant has reported medication efficacy. For example, at an office visit on the same date Dr. Braumiller rendered his opinion, the claimant reported the medications were effective and denied any side effects. Notably, the claimant's most

recent office visits indicate he was "stable." [Tr. 895–900]. The claimant testified that he is seen every three months, a treatment level that does not support absences of four or more days per month. When considered as a whole, the claimant's GAF ratings, noted above, indicate his ongoing symptoms have been moderate. Last but not least, the claimant's mental status exams in his treatment notes do not contain abnormalities that would bolster Dr. Braumiller's opinion.

(Tr. 23–24).

## V.    DISCUSSION

Plaintiff's first claim centers upon the following comment made by Dr. Peterson in conjunction with his opinion addressed above: "[Plaintiff] should be able to sustain average performance and maintain a more steady balance of emotion including anger and/or anxiety management with a supportive, communicative supervisor, clear, attainable performance goals, and a more isolated performance environment" (Tr. 130).[6] Plaintiff contends that, despite giving great weight to Dr. Peterson's opinion,

---

[6] While it may be technically correct to attribute this statement and related findings, as Plaintiff does, to Dr. Peterson since Dr. Peterson affirmed the findings of Dr. Partyka, the findings are more directly attributable to Dr. Partyka since he originally drafted them. Dr. Peterson's report is styled as a reconsideration (Tr. 121), and comparison of the two reports shows that nearly all of the original language from Dr. Partyka's opinion is preserved verbatim (or as a photocopy) in Dr. Peterson's report, including the passages in question. *Compare* Tr. 117–18 with Tr. 130. Dr. Peterson's own comment, following the section that contains the statement above, confirms this: "RECON: I HAVE REVIEWED ALL THE EVIDENCE IN THE FILE & THE MRFC OF 08/18/11 IS AFFIRMED AS WRITTEN" (Tr. 130 (Caps in original)). With this in mind, the court addresses Plaintiff's claim with the opinions of both doctors in mind, even if Dr. Peterson's opinion is the only one cited.

the ALJ failed to account for Dr. Peterson's statement, as quoted above, that Plaintiff would benefit from a "communicative supervisor."

First, it bears noting that the statement in question from Dr. Peterson does not appear to resolutely require a "supportive, communicative supervisor."  Rather, the opinion states that Plaintiff "*should be able* to sustain average performance and maintain *a more steady balance* of emotion including anger and/or anxiety management" with such a supervisor (Tr. 130) (emphasis supplied).  Thus, while a "supportive, communicative supervisor" is surely seen as a positive factor, it is not at all certain that it would be an outcome-determinative factor.  Additionally, the supervisor factor is but one of three factors that, in Dr. Peterson's opinion, would together contribute to Plaintiff's ability to perform and balance his emotions (the other two being clear, attainable performance goals and a more isolated performance environment).

Moreover, the court notes that the ALJ's holding in fact did reference the "communicative supervisor" part of Dr. Peterson' opinion when he stated that Plaintiff "might have mild to moderate difficulties . . . asking questions, and accepting instructions and criticism from supervisors" (Tr. 23) (citing to Tr. 110–19).  The ALJ may have framed his statement in terms of Plaintiff's communicative capabilities

instead of specifically identifying what type of supervisor would accommodate those lesser capabilities, but this is not to say that the ALJ failed to address the issue. Furthermore, the ALJ stated in his RFC determination that Plaintiff would be limited to communicating with supervisors (and co-workers) on a basic level, would require short and simple instructions and simple work decisions, needed a well-spaced work environment to reduce his interaction with others, and should have no contact with members of the public (Tr. 18–19).

Importantly, while substantial weight must be given to a treating physician's diagnoses and opinions unless the ALJ states reasons showing good cause for finding otherwise, *see* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(c), Dr. Peterson was not a treating physician. It is true that the ALJ "generally should explain the weight given to opinions from [medical] sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, such opinions may have an effect on the outcome of the case." 20 C.F.R. § 404.1527(f)(2). However, Plaintiff seems to assert that, once the ALJ assigned "great weight" to Dr. Peterson's opinion, he was obliged adopt all of Dr. Peterson's statements or findings within that opinion. Plaintiff provides no case law

to establish this point, nor is the court aware of any.[7]  Rather, use of the term "great weight" is simply a marker to generally indicate the degree to which the ALJ credits an opinion.  Should the ALJ's ultimate findings not "measure up" to the "great weight" attribution, this would only signify an error in nomenclature, not in the actual substance of the ALJ's findings.

Finally, and more generally, "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision' enables the district court 'to conclude that the ALJ considered [the claimant's] medical condition as a whole.'"  Adams v. Comm'r, Soc. Sec. Admin., 586 F. App'x 531, 533 (11th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)).  The court finds in this case that the ALJ adequately addressed Plaintiff's issues with communication with others, including taking directions from

---

[7] Plaintiff does cite to Evans v. Colvin, No. 3:12-CV-84 (CAR), 2013 WL 5433587 (M.D. Ga. Sept. 27, 2013), as a similar situation, but the court finds that Evans, which in any event is a decision that is not binding on this court, does not establish, much less cite case law to support, the proposition that giving great weight to a physician's opinion concomitantly establishes a requirement that the ALJ adhere to all the elements of that opinion.  Further, in Evans, the ALJ failed to incorporate nearly the whole of the physician's opinion in his analysis and in so doing failed to address the substantive issues raised in that physician's opinion, leading the court to conclude that the ALJ's opinion was not supported by substantial evidence.  Id., at *3–4.  As described herein, the instant case is distinguishable because the ALJ did address much of the substance of Dr. Peterson's opinion.

Case No.: 3:16cv500/MCR/EMT

or otherwise interacting with supervisors, and the ALJ's opinion is supported by substantial evidence.

Plaintiff's second claim is that the ALJ improperly substituted his own opinion for the opinion of Dr. Braumiller concerning the frequency of psychiatric treatment necessary for Plaintiff. More specifically, Plaintiff takes issue with the following statement made by the ALJ: "The claimant testified that he is seen every three months, a treatment level that does not support absences of four or more days per month" (Tr. 23–24). Thus, Plaintiff's claim is that the ALJ impermissibly "played doctor" by stating essentially that a person with a lower frequency of doctor visits would not be expected to have a significant number of absences from work. Hence, Plaintiff rhetorically asks, "How often would a psychiatrist need to see a patient in order to justify an opinion that such an individual would be absent from competitive employment four or more times per month?" (ECF No. 9 at 31).

The ALJ assigned little weight to the opinion of Dr. Braumiller, a treating physician. Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis, 125 F.3d at 1439–41; Edwards, 937 F.2d at 583; Sabo v. Commi'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause

exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.* § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC

(*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. *Id.* § 404.1527(d).

Here, Plaintiff challenges the ALJ's evaluation of Dr. Braumiller's opinion solely on the ground that the ALJ appeared to have substituted his own opinion for that of Dr. Braumiller. What this argument overlooks is that the ALJ, in speaking to Plaintiff's ability to consistently attend work, did not formulate a *medical* opinion, which is ordinarily the province of medical professionals, but an opinion on Plaintiff's capacity to work, which is the province of the ALJ. An ALJ is concerned with the opinions of medical professionals only insofar as they relate to a claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his condition." Lewis, 125 F.3d at 1440. Thus, a doctor's opinion is certainly relevant to the ALJ's analysis, but it is not determinative, for the ultimate conclusions regarding RFC and the ability to work, which are not medical but instead are administrative findings, are expressly reserved for the ALJ. *See, e.g.,* Wagner v. Berryhill, No. 1:17cv93/MW/CAS, 2017 WL 6419305, at *7 (N.D. Fla. Nov. 30, 2017), *report and recommendation adopted,* 2017 WL 6419289 (N.D. Fla. Dec. 15,

2017); Lewis v. Colvin, No. 5:13-cv-00560-LSC, 2014 WL 4686472, at *4 (N.D. Ala. Sept. 17, 2014).

That said, the court additionally finds that the ALJ did not solely base his conclusion on the relative sparsity of psychiatric visits.[8]  The ALJ also identified as factors Plaintiff's treatment records, particularly his records of outpatient medication management; Plaintiff's reports regarding the effectiveness of his medication and the absence of side effects; his GAF ratings and mental status evaluations in his treatment notes; and his recent office visits indicating he was stable (Tr. 23–24).  Thus, the frequency of Plaintiff's office visits is simply one indicator among others that supported the ALJ's conclusion that Dr. Braumiller's opinion should be discounted. The court in its review of the evidence otherwise finds that good cause existed to assign less than substantial weight to Dr. Braumiller's opinion as a treating physician.[9]

---

[8]  While the court will not perform a long-winded parsing of the ALJ's statement that "[t]he claimant testified that he is seen every three months, a treatment level that does not support absences of four or more days per month," it should suffice to say that, taken in context, the statement does not purport to represent that frequency of psychiatric office visits is the *only* factor that informed the ALJ's discounting of Dr. Braumiller's opinion regarding work absences, as discussed herein.

[9]  As a final point, it should be noted that Dr. Braumiller's evaluation was provided on a questionnaire form wherein he simply circled the correct "multiple choice" answer or filled in the blanks (Tr. 883–85).  Medical evaluations provided on preprinted forms generally do not provide persuasive evidence of the validity of the opinions expressed therein.  *See, e.g.,* Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 n.35 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**:

That Nancy A. Berryhill is substituted for Carolyn W. Colvin as Defendant in this action.

And it is respectfully **RECOMMENDED**:

1.      That the decision of the Commissioner be **AFFIRMED**, and that this action be **DISMISSED**.

2.      That **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.      That the Clerk be directed to close the file.

At Pensacola, Florida this <u>28</u>[th] day of February 2018.

---

who merely checked boxes on a form without providing any explanation for his conclusions); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987).

Case No.: 3:16cv500/MCR/EMT

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

### <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.